# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

ACI WORLDWIDE CORP.,

      Plaintiff,

      v.

KEYBANK NATIONAL ASSOCIATION
and KEYCORP,
      Individually and as successor in
interest to FIRST NIAGARA FINANCIAL
GROUP, INC.,

      Defendants.

CIVIL ACTION NO: 1:17-cv-10662-IT

---

## SECOND AMENDED COMPLAINT

ACI Worldwide Corp. brings this action for breach of contract, fraudulent inducement, and civil conspiracy against KeyCorp and KeyBank National Association, and for exemplary damages under Texas law for the defendants' role in fraudulently inducing ACI into a contract they never intended to honor. For its complaint, ACI states as follows:

PARTIES

1.     ACI Worldwide Corp. ("ACI") is a corporation organized under the laws of the State of Nebraska with a principal place of business at 6060 Coventry Drive, Elkhorn, Nebraska 68022.

2.     KeyCorp is a corporation organized under the laws of the State of Ohio and is headquartered in Cleveland, Ohio. KeyCorp is the parent organization of KeyBank National Association.

3.      On information and belief, KeyBank National Association ("KeyBank") is a national banking association organized under the laws of the United States of America with a principal place of business at 4900 Teideman Road, Society National Bank, Brooklyn, Ohio 44114. On information and belief, KeyBank is a wholly-owned subsidiary of KeyCorp.

4.      On information and belief, First Niagara Financial Group, Inc. ("FNFG") was a regional banking association organized under the laws of the state of Delaware with a principal place of business in New York, however, that corporation was acquired by KeyCorp in a merger on August 1, 2016 pursuant to an Agreement and Plan of Merger executed on October 30, 2015 (the "Merger Agreement").  Under applicable law and pursuant to the Merger Agreement, KeyCorp assumed all property, rights, privileges, powers, franchises, debts, liabilities, and duties of FNFG and its wholly-owned subsidiary, First Niagara Bank, which was subsequently merged into KeyBank. KeyCorp and KeyBank are, therefore, liable for all harms and damages inflicted by FNFG and First Niagara Bank, and assumed all of their rights and liabilities as successors-in-interest.

## JURISDICTION

5.      The United States District Court for the District of Massachusetts has diversity jurisdiction over this action pursuant to 28 U.S.C. §1332 because this action is between entities whose principal places of operation are in different states, and the amount in controversy exceeds $75,000, exclusive of costs and interest. For purposes of diversity jurisdiction, KeyBank and KeyCorp are deemed citizens of the State of Ohio.

6.      The United States District Court for the District of Massachusetts has personal jurisdiction over KeyBank because KeyBank is a National Association that transacts a substantial amount of business in the Commonwealth of Massachusetts.

2

7.     Jurisdiction over KeyBank is proper under the Massachusetts long-arm statute, Mass. Gen. L. ch. 223A §3.

8.     The United States District Court for the District of Massachusetts has personal jurisdiction over KeyCorp because KeyCorp transacts a substantial amount of business in the Commonwealth of Massachusetts.

9.     Jurisdiction over the KeyCorp is proper under the Massachusetts long-arm statute, Mass. Gen. L. ch. 223A §3.

VENUE

10.    Venue is proper in the United States District Court for the District of Massachusetts because:

a.     ACI is registered to do business in the Commonwealth of Massachusetts;

b.     KeyBank is a National Banking Association with branch offices in the Commonwealth of Massachusetts in Chicopee, East Longmeadow, Feeding Hills, Holyoke, Ludlow, Southwick, Westfield, and West Springfield; and

c.     One of the contracts at issue in this complaint, the "ACI Application Services Master Agreement No. D-212", was entered into in Massachusetts by ACI's predecessor-in-interest, ACI Worldwide (MA), Inc. and KeyBank's predecessor-in-interest and FNFG subsidiary, First Niagara Bank.

FACTS

11.    On December 21, 2001, KeyCorp's predecessor-in-interest FNFG entered into the "Internet Banking System Licensing and Web Technologies Agreement (Data Center)" (hereinafter, "OLB Agreement") with ACI's predecessor-in-interest, S1, Inc. The Agreement

3

was subsequently amended and extended several times, including on April 21, 2006, April 30, 2009, and March 21, 2016.

12.     On March 31, 2009, ACI's predecessor-in-interest ACI Worldwide (MA), Inc. and First Niagara Bank, a subsidiary of FNFG and KeyCorp's predecessor-in-interest, entered into the "ACI Application Services Master Agreement No. D-212" (hereinafter, "EB Agreement"). The EB Agreement was subsequently amended and extended several times, including on December 19, 2011 and September 30, 2014.

13.     By virtue of the OLB Agreement and the EB Agreement, First Niagara Financial Group and First Niagara Bank (collectively referred to hereinafter as "FNFG") were able to offer online banking to their customers.

14.     In June 2015, ACI began the process of renewing FNFG's OLB Agreement under which the defined Renewal Term was set to expire on March 20, 2016. The process of renewing such agreements typically takes between nine months to a year. Given the time it takes to negotiate terms, and for other reasons discussed below, ACI offers five-year renewal terms.

15.     Consistent with this practice, in October of 2015, ACI submitted an offer to FNFG to provide hosting and software maintenance services at a price discounted from the existing online banking agreements for a five-year term. FNFG declined to renew for a five-year term.

16.     On October 30, 2015, KeyCorp announced that it intended to acquire FNFG. Among other synergies, KeyCorp expected that there would be substantial cost savings given, for instance, redundant personnel, superfluous locations, and unnecessary vendor contracts and software. In fact, KeyCorp announced that "[s]hareholders of both companies will benefit from annual cost savings in excess of $400 million from maximizing efficiencies of technology

4

infrastructure, procurement savings across the combined organization, and optimizing overlapping branches."

17.     For the next several months, KeyCorp made repeated statements to its shareholders and others, as well as in filings with the Securities Exchange Commission and other federal agencies, regarding the expected cost savings of the merger, which included the identification of technology synergies. It did so in order, *inter alia*, to allay the concerns of investors about the benefits of the merger and assure the marketplace that its plans were not only sound but financially beneficial.

18.     In a November 2, 2015 investor call, for instance, KeyCorp CFO Don Kimble reported:

> We also have a benefit to leverage our existing technology to drive significant expense synergies. First Niagara had undertaken a strategic investment plan to enhance their technology platform, which was built in more of an outsourced environment. That program was performing as expected and will ease the conversion to Key's technology infrastructure, which is a significant source of cost savings. Other projected cost savings, *approximately 40%*, are related to technology and third party vendor contract savings. Our cost savings estimate results from an extensive review of all operational and back office functions. We have very granular plans and time tables for the cost savings and are confident in our ability to achieve these plans. [Emphasis added]

19.     In KeyCorp's S-4 Registration Statement filed with the Securities and Exchange Commission dated November 30, 2015, KeyCorp stated that it was given access to "an electronic data room with non-public information regarding First Niagara's . . . contract and vendor information."  The Form S-4 notes several instances that KeyCorp's Board of Directors was made aware of the company's due diligence review with respect to the proposed merger, including on October 23, 2015 when the Board was provided with a "summary of KeyCorp's acquisition and integration plans," and on October 29, 2015 when the Board reviewed the "terms

of the proposed transaction and the strategic rationale and anticipated benefits of the proposed

transaction to KeyCorp's shareholders."

20.     It was, on information and belief, evident to KeyCorp very early in the due-

diligence process that FNFG's contracts with ACI would be one of the places where KeyCorp

intended to reduce vendor costs. KeyBank had a legacy online banking system that it used with

all of its retail and commercial customers, and it would have quickly become apparent that ACI's

solutions could be replaced with these. The references to "technology and third party vendor

contract[s]" and the "extensive review of all operational and back office functions" during the

November 2, 2015 investor call would necessarily have included the proprietary software

licensed under the OLB and EB Agreements.  On information and belief, these Agreements were

provided to ACI in the "electronic data room" referenced by ACI in the Form S-4. ACI's

proprietary systems and contract terms, including but not limited to pricing information, is highly

confidential, not publicly available, and was protected by confidentiality provisions in all of its

contracts with FNFG.

21.     The OLB Agreement contains a confidentiality provision in Paragraph 12, entitled

Confidentiality, which states, in part, the following:

> [ACI] and Client further agree that except as expressly authorized
> in writing in advance by the other party, neither of them will, either
> during the existence of this Agreement or at any time thereafter, (i)
> copy or disclose Confidential Information to any third party except
> to its employees or consultants with a bona fide need to know the
> same in order to use the Confidential Information for the purposes
> of this Agreement . . .

22.     The EB Agreement contains a confidentiality provision in Paragraph 9, entitled

Confidentiality, which states, in part, the following:

> 9.2 Obligations. Each Party receiving Confidential Information (the
> "Receiving Party") shall use the Confidential Information disclosed

6

by the other Party (the "Disclosing Party") solely for the purposes of performing its obligations under this Master Agreement and Schedules and shall disclose such Confidential Information only as specifically authorized in Section 9.3 below . . . .

9.3 Restrictions. Notwithstanding Section 9.2, Receiving Party shall not disclose Confidential Information of Disclosing Party, except to its employees, consultants or any third party having a legitimate business purpose with respect to this Master Agreement or a Schedule and having a need to know such Confidential Information.

23.     FNFG's disclosure of the Agreements and access to ACI's technology were made in violation of the confidentiality provisions contained within the EB Agreement and the OLB Agreement, and KeyCorp's and KeyBank's receipt of and use of the improperly obtained information constituted misappropriation of ACI's trade secrets.  FNFG understood that it had no right to supply this information to KeyBank and KeyCorp, and they knew they had no right to possess that information, but together FNFG, KeyBank, and KeyCorp disregarded their legal obligations so that KeyCorp could perform the synergy evaluations that would allow it to make aggressive cost-savings projections to its shareholders, thus allowing the merger to move forward.  It was not until January 7, 2016 that KeyCorp finally asked ACI for permission to access its confidential and proprietary information, well after it had already completed its analyses.

24.     An identical scenario played out with Northwest Bank ("Northwest"), who executed a purchase and sale agreement to acquire eighteen FNFG branches on April 28, 2016 ("Branch Acquisition").  On information and belief, FNFG provided Northwest with the same proprietary and confidential information that it provided to KeyCorp, allowing Northwest to perform the same type of analysis that KeyCorp had performed.  Upon acquisition of the eighteen branches, Northwest similarly decommissioned ACI's services at those locations.

25.     On May 5, 2016, FNFG supplied ACI with a Confidentiality Agreement between it and Northwest which was designed to protect those parties' proprietary information, but it never requested ACI's permission to disclose ACI's confidential and propriety information to Northwest.  By that time, on information and belief, FNFG had already breached the confidentiality provisions contained in the OLB and EB Agreements, just as it had during KeyCorp's acquisition. On information and belief, Northwest required access to the misappropriated information in order to perform the analysis necessary to determine whether to proceed with the Branch Acquisition.

26.     Although KeyCorp, KeyBank, and FNFG knew well before the closing on the FNFG merger that neither KeyCorp nor KeyBank would be using ACI's online banking systems, it was equally apparent that in order to transition FNFG customers to KeyBank's legacy platforms, the bank would need ACI's extensive cooperation.

27.     The problem FNFG still faced, however, was ACI's insistence on a five-year renewal term. FNFG's Chief Executive Officer Gary Crosby confirmed this in a conversation with ACI's Chief Executive Officer Philip Heasley during which he endeavored to persuade Mr. Heasley to allow FNFG to enter into a short-term extension of the OLB agreement. Mr. Crosby stated in substance that ACI's insistence on a five-year renewal term could prevent KeyCorp from acquiring FNFG.

28.     For a number of reasons, including ACI's substantial interest in generating predictable recurring revenue, ACI was unwilling to deviate from its established practice requiring at least five-year renewal terms. As other senior ACI executives had before him, Mr. Heasley conveyed this to Mr. Crosby.

8

29.     By October 30, 2015, FNFG and KeyCorp had signed the Merger Agreement. By virtue of that agreement, FNFG required KeyCorp's permission to enter into the OLB Amendment. Indeed, under the Merger Agreement, FNFG was prohibited from entering into any contract with a liability in excess of $10 million without KeyCorp's approval.

30.     Given the necessity of maintaining a contractual relationship with ACI, KeyCorp became involved in the final stages of negotiations concerning the OLB Amendment, and ultimately approved FNFG's execution of the five-year extension reflected in the OLB Amendment in March 2016. By that time, KeyCorp and FNFG were in the final stages of concluding the merger.

31.     The OLB Amendment requires FNFG to pay a "Subscription and Hosting Fee" in the amount of $295,833.00 per month during the Second Renewal Term. The OLB Amendment further states:

> If at any time prior to the expiration of the Second Renewal Term, Customer has paid a minimum cumulative amount of $17,750,000 under this Amendment (the "Minimum Commitment"), then Customer may terminate the Agreement prior to such expiration upon written notice to ACI, such notice to specify the effective termination date. For avoidance of doubt, Customer agrees to pay the Minimum Commitment to ACI during the Second Renewal Term and all Monthly Subscription and Hosting Fees shall be applied against the Minimum Commitment.

32.     FNFG's Frank Polino spoke with Sylvie Boucheron-Sounier and Brad Freundlich of ACI on or about March 20, 2016 and stated that FNFG had relented with KeyCorp's approval, and would reluctantly agree to a five-year extension of the OLB Agreement under the terms memorialized in the OLB Amendment. Plainly implicit in this agreement was the promise to abide by the terms of the renewal, all of which had been outlined in previous communications between the parties, and in the draft OLB Amendment, which Mr. Polino had in his possession.

9

This was obviously welcome news upon which ACI relied, and it began to undertake the steps necessary to continue to provide maintenance and service to FNFG and ultimately its successor KeyCorp including allocating resources.  The OLB Amendment was fully executed on March 21, 2016.

33.     Neither Mr. Polino on behalf of FNFG nor KeyCorp ever intended to abide by the OLB Amendment. Mr. Polino misrepresented FNFG's and KeyCorp's intention to abide by the OLB Amendment, and then signed the amendment with KeyCorp's permission and at its urging simply because it was expedient to do so in order to induce ACI to remain engaged and committed to providing whatever assistance it could provide to facilitate the merger. Furthermore, by signing the OLB Amendment, KeyCorp ensured that it would continue to have access to ACI's intellectual property and confidential and proprietary business information, and would have ACI's resources and attention as KeyCorp endeavored to meet its aggressive merger plans and cost-consolidation targets.

34.     Within two months of the merger, KeyBank directed ACI to decommission FNFG's online banking system, effectively breaching the EB and OLB Agreements. ACI complied with this directive. On October 12, 2016, following substantive decommission of the online banking systems, ACI wrote to KeyBank listing the amounts due by virtue of its breach of the EB Agreement and the OLB Agreement. KeyBank requested that the systems remain online so that it could access static historical data until December 31, 2016, but daily operations of ACI's system by KeyBank was intended to effectively cease on October 10, 2016.

35.     On information and belief, well in advance of its notice to ACI of its intention to abandon its ACI agreements, KeyCorp, KeyBank, and FNFG invented justifications for

KeyBank's breach of the OLB Amendment.  FNFG introduced some of these justifications when it signed the agreement, but then dropped its complaints to assure ACI's assistance.

36.     In her August 23, 2016 letter to ACI, for instance, KeyBank's Chief Information Officer Amy Brady, formerly of FNFG, described ACI as "one of our most trusted suppliers" and thanked ACI for its help at a time "during which your role is essential to our success." Ms. Brady closed her letter by telling ACI "how much we value the important role you play in making the merger a success," and reminding ACI that its "expertise will be more vital than ever during both of these time frames [merger and consolidation]."

37.     Not two months later, after KeyBank no longer needed ACI's help, it renewed its accusations of coercion. In KeyBank's November 4, 2016 response to ACI's October invoice, KeyBank argued an untenable interpretation of the EB Agreement's limitation of liability provision, insisted that ACI had not negotiated in good faith thus justifying the breach, and claimed that FNFG had been coerced into entering the OLB Amendment renewal, rendering it unenforceable.

38.     None of these putative justifications had any merit, and both the underlying facts and the abrupt change in KeyBank's tone strongly suggests that KeyCorp and KeyBank knew this well before they advanced these justifications. Together, KeyCorp and KeyBank comprise a highly sophisticated and very successful financial company with approximately $135 billion in assets. According to the public announcement of the merger, the combined bank resulting from the merger is the "13th largest commercial bank headquartered in the US". KeyCorp and KeyBank have their own in-house attorneys and some of the world's largest law firms retained on an as-needed basis. Before ever alleging coercion, it is therefore to be expected that KeyCorp and KeyBank researched the prima facie elements of coercion or duress under the applicable

law. It therefore knew that there can be no duress unless: (1) there is a threat to do something that the party threatening has no legal right to do; (2) there is some illegal exaction or some fraud or deception; and (3) the restraint is imminent and such as to destroy free agency without present means of protection. Deer Creek Ltd. v. North Am. Mortgage Co., 792 S.W.2d 198, 200 (Tex. App. Dallas 1990). KeyCorp has not alleged and cannot allege a single one of these variables. In conjunction with the facts pleaded above, the fact that KeyBank alleged coercion notwithstanding law to the contrary in order to justify its breach is more than "'slight circumstantial evidence' of fraud." Aquaplex, Inc. v. Rancho La Valencia, Inc., 297 S.W.3d 768, 775 (Tex. 2009) quoting Spoljaric v. Percival Tours, Inc., 708 S.W.2d 432, 435 (Tex. 1986).

39.     Furthermore, KeyBank effectively waited to press its allegations of misconduct until after ACI provided KeyBank with all the services necessary to transition FNFG's commercial and retail customers smoothly to KeyBank's online banking systems. In other words, FNFG and KeyCorp deceived ACI into believing that they would honor their contractual commitments just long enough to ensure completion of the work they needed from ACI in order to meet the aggressive cost-savings projections KeyCorp had repeatedly represented to its investors. Once that work was completed, and ACI's good faith and diligence was no longer required, KeyCorp, through KeyBank, not only breached the agreements, but also fictionalized justifications that only serve to confirm that KeyCorp never intended to abide by the agreement in the first place.

40.     Even after the systems were decommissioned, KeyBank continued to use those systems, originally licensed under the EB and OLB Agreements, without license to do so, simply because it was expedient. Unbeknownst to ACI, KeyBank surreptitiously continued to use its

services well beyond the date of decommission and without payment to ACI. ACI discovered

this unauthorized use of services on or about February 23, 2017.

41.     The OLB Agreement prohibits the unauthorized use of ACI's technology after

termination of a contract in paragraph 9, entitled Termination, which states the following:

> On Agreement termination, Client shall discontinue use of The
> System and return all licensed products and any and all other
> confidential information in its possession to [ACI], or, at [ACI's]
> option, destroy such materials, including all copies or partial copies
> thereof.

42.     The EB Agreement prohibits the unauthorized use of ACI's technology after

termination of a contract in paragraph 13.3, entitled Effect of Termination, which states, in part,

the following:

> Upon termination of this Master Agreement, (i) Customer shall
> immediately cease using the Services under this Master Agreement
> and any and all Schedules . . . (iii) each Party shall irretrievably
> destroy all copies of Documentation and the Confidential
> Information of the other Party on tangible media in such Party's
> possession or control or return such copies to the other Party, (iv)
> each Party shall certify in writing to the other Party that it has
> returned or destroyed such Confidential Information, with no copies
> retained . . . .

43.     ACI relied detrimentally on FNFG's and KeyCorp's five-year contract

commitments. In order to perform the services required under the OLB Amendment, ACI was

obliged to allocate resources including the dedication of personnel. ACI also factored KeyCorp's

five-year commitment into its fiscal planning and budgeting. ACI relies on the predictability of

its five-year contracts in determining not only its overall goals but also in business planning

generally. Indeed, recurring revenue, specifically its 60-month Backlog, is a critical financial

metric in ACI's public financial reporting. Furthermore, by the time of KeyBank's breach,

predictable revenue from the OLB Agreement had been reported by ACI's holding company

13

ACI Worldwide, Inc. to its shareholders. ACI paid commissions to the sales team that secured the renewal, and expended nine months of time and expense negotiating the renewal that it would not have spent had ACI known that neither KeyCorp nor FNFG intended to comply with the renewal obligations.

44.     ACI's expenditures of money and human capital were not only predictable but inevitable, and both KeyCorp and FNFG understood this. Notwithstanding this fundamental knowledge – indeed despite it – both KeyCorp and FNFG lied to ACI about their willingness to honor the renewal that FNFG signed at KeyCorp's insistence. KeyCorp's breach of contract through KeyBank was, therefore, willful and malicious or else reflects a conscious indifference to ACI's rights under the FNFG contracts.

45.     At the time of the breach, ACI had been paid $2,662,497 of the $17,750,000 Minimum Commitment under the OLB Agreement and OLB Amendment.

46.     Under the EB Agreement as amended and extended, FNFG's successor-in-interest KeyCorp and/or KeyBank remains contractually obligated to pay ACI $384,132 in monthly subscription fees until and including October 31, 2019. During the sixty-two (62) month term of the EB Agreement, ACI was to have been paid $23,816,184. At the time of KeyBank's breach, ACI had been paid $10,755,696.

47.     At the time of KeyBank's breach, ACI had provided professional services pursuant to Addendum 54 to Schedule 01 of the EB Agreement, and had billed over $436,000 for these services. The defendants also refuse to pay these fees.

## COUNT I
### (Breach of Contract: OLB Agreement)

48.     ACI incorporates by reference the allegations of paragraphs 1 through 47 of this Complaint.

14

49.     KeyCorp merged with FNFG, and with that merger assumed the contractual obligations to ACI under the OLB Agreement as amended and extended.

50.     On October 31, 2016, KeyCorp, through KeyBank, breached the OLB Agreement, including the OLB Amendment, by refusing to pay the monthly Subscription and Hosting Fee, thereby causing ACI damages.

51.     In addition, KeyCorp and/or KeyBank has breached the OLB Agreement by refusing to pay the Minimum Commitment as defined in paragraph 1.3 of the OLB Agreement, thereby causing ACI damages.

52.     By virtue of its breaches of contract, the defendants are liable to ACI in the amount of $15,087,483, plus interest.

## COUNT II
### (Fraudulent Inducement: OLB Agreement)

53.     ACI incorporates by reference the allegations of paragraphs 1 through 52 of this Complaint.

54.     KeyCorp is the successor-in-interest to FNFG, and as a result, has assumed all of FNFG's liabilities.

55.     Based on its communications with KeyCorp executives, FNFG knew that its successor-in-interest did not intend to comply with the obligations in the OLB Amendment. Nevertheless, FNFG in the person of Frank Polino and others, represented that FNFG, and by virtue of the pending merger KeyCorp, would honor the five-year renewal term.

56.     These material misrepresentations were not only made in the form of the OLB Amendment itself, but also orally by Frank Polino, FNFG's Senior Vice President and Merger Integration Executive, who later became a KeyBank employee.

15

57.     These representations were false when made, and they were made willfully with the intention of inducing ACI to enter into the OLB Amendment and to provide services and other resources necessary to allow the transition and consolidation of online banking services from FNFG to KeyBank. If FNFG and KeyCorp had not committed to a five-year term on the OLB agreement, ACI's OLB Agreement would have terminated in March 2016, and ACI would have decommissioned the system at that point in time as was its right and obligation.

58.     As a result of FNFG's and KeyCorp's deception, ACI has suffered economic losses.

59.     KeyCorp, individually and as successor-in-interest to FNFG, is liable to ACI for all damages suffered as a result of FNFG's fraud.

60.     Exemplary damages should be assessed against KeyCorp inasmuch as it has acquired FNFG's tort liabilities, including liability for fraudulent inducement.

## COUNT III
## (Civil Conspiracy: OLB Agreement)

61.     ACI incorporates by reference the allegations of paragraphs 1 through 60 of this Complaint.

62.     FNFG induced ACI into executing the OLB Amendment with full knowledge that KeyCorp, its future successor-in-interest, did not intend to fulfil its obligations under that agreement. On information and belief, executives from FNFG and KeyCorp agreed, in substance, prior to FNFG signing the OLB Amendment that KeyCorp would breach that amendment. FNFG in fact required KeyCorp's permission to sign the OLB Amendment, and KeyCorp gave FNFG that permission even though both parties knew that KeyCorp would breach the OLB Agreement as soon ACI completed its assistance with the merger and with data integration.

63.     FNFG committed its fraud with the direction and approval of KeyCorp, and that fraud was in furtherance of a civil conspiracy between KeyCorp and FNFG to deceive ACI into extending the OLB Agreement which KeyCorp never intended to honor.

64.     On information and belief, FNFG and KeyCorp conspired to deceive ACI in order to ensure ACI's full participation in all technical efforts necessary to transition FNFG's online banking and commercial banking customers to KeyBank, and in order to have access to ACI's applications long enough to effect that transition.

65.     On October 31, 2016, the defendants breached the OLB Agreement, including the OLB Amendment, by refusing to comply with the obligations under Paragraph 1.0 *et seq.*, of the OLB Amendment.

66.     By virtue of the civil conspiracy between KeyCorp and FNFG, KeyCorp is liable to ACI for all damages suffered as a result of FNFG's fraudulent inducement, which includes $15,087,483, plus interest.

67.     KeyCorp is further liable to ACI for exemplary damages by virtue of the fraud perpetrated as a co-conspirator.

## COUNT IV
### (Breach of Contract: EB Agreement)

68.     ACI incorporates by reference the allegations of paragraphs 1 through 67 of this Complaint.

69.     KeyCorp merged with FNFG, and by virtue of that merger assumed FNFG's contractual obligations to ACI under the EB Agreement as amended and extended.

70.     On October 31, 2016, KeyCorp, through KeyBank, breached the EB Agreement by refusing to make further payment under the agreement, thereby causing ACI damages.

71.     By virtue of their breaches of contract, the defendants are liable to ACI in the amount $13,060,488, plus interest.

## COUNT V
### (Breach of Contract: Addendum 54)

72.     ACI incorporates by reference the allegations of paragraphs 1 through 71 of this Complaint.

73.     KeyCorp merged with First Niagara Financial Group, and with that merger assumed the bank's contractual obligations under Addendum 54 to Schedule 01 of the EB Agreement.

74.     On October 31, 2016, KeyCorp, through KeyBank, breached Addendum 54 to Schedule 01 of the EB Agreement.

75.     By the time of the defendants' breach, ACI had performed services under Addendum 54 to Schedule 01 of the EB Agreement in compliance with its contractual obligations.

76.     ACI billed the defendants $437,812 for its professional services.

77.     The defendants have refused to pay for the services rendered.

78.     The defendants owe ACI $437,812 for professional services rendered pursuant to Addendum 54 to Schedule 01 of the EB Agreement, plus interest.

## COUNT VI
### (Breach of Contract - Confidentiality: OLB and EB Agreements)

79.     ACI incorporates by reference the allegations of paragraphs 1 through 78 of this Complaint.

80.     The OLB Agreement contains a confidentiality provision in Paragraph 12, entitled Confidentiality.

18

81.     FNFG breached the OLB Agreement when it shared confidential information with Northwest without ACI's written consent or knowledge.

82.     The EB Agreement contains a confidentiality provision in Paragraph 9, entitled Confidentiality.

83.     FNFG breached the EB Agreement when it shared confidential information with Northwest without ACI's written consent or knowledge.

84.     KeyCorp acquired FNFG, and with that merger assumed the liabilities of FNFG.

85.     As a result of FNFG's breaches of contract, ACI has suffered damages.

86.     KeyCorp, as successor-in-interest to FNFG, is liable to ACI for FNFG's breach of the confidentiality provisions of the EB and OLB Agreements.

87.     In addition, KeyCorp is liable for ACI's costs and expenses in enforcing the Confidentiality provision of the EB Agreement, as stated in Paragraph 9.4 of that Agreement. Paragraph 9.4 states that if FNFG fails to attempt to remedy a breach of confidentiality, "[ACI] or its designee may take such actions in its own name or [FNFG's] name and at [FNFG's] expense," for which KeyCorp is now liable.

## COUNT VII
### (Breach of Contract – Continued Use: OLB and EB Agreements)

88.     ACI incorporates by reference the allegations of paragraphs 1 through 87 of this Complaint.

89.     The EB Agreement and the OLB Agreement prohibited KeyBank from using ACI systems after termination of the Agreements.

90.     KeyBank breached the EB and OLB Agreements by continuing to access and use ACI's systems without license or permission after it breached the EB Agreement and the OLB Agreement.

19

91.    As a result of KeyBank's breach of contract, ACI has suffered damages.

## COUNT VIII
### (Conversion: Proprietary Software)

92.    ACI incorporates by reference the allegations of paragraphs 1 through 91 of this Complaint.

93.    At all times relevant herein, ACI owned all rights, title, and interest in the proprietary software licensed to FNFG and the defendants by the EB and OLB Agreements.

94.    KeyBank had no right to access and use ACI's proprietary software without the express permission of ACI.

95.    After the defendants breached the EB and OLB Agreements, which granted the defendants a license to use ACI's software products, the defendants continued to access and use ACI's software without ACI's authorization or consent.

96.    Upon information and belief, the defendants' acts of conversion were knowing, willful, and deliberate.

97.    ACI suffered damages as a result of the defendants' acts of conversion.

WHEREFORE, ACI Worldwide Corp. respectfully requests that this Court:

A.    Enter judgment in ACI's favor on all counts of this Complaint;

B.    Pursuant to Tex. Civ. Prac. & Rem. Code Ann. § 41.008 (West), award exemplary damages awarded against defendants equal to two times the amount of economic damages plus an amount equal to any noneconomic damages found by the jury, not to exceed $750,000;

C.    Award ACI costs and attorneys' fees; and

D.    Grant ACI such other and further relief as the Court deems just and proper.

Respectfully submitted:

ACI WORLDWIDE CORP.,

/s/ Kevin T. Peters
Kevin T. Peters (BBO #550522)
kevin.peters@gesmer.com
Jason Armiger (BBO #685862)
jason.armiger@gesmer.com
GESMER UPDEGROVE LLP
40 Broad Street
Boston, Massachusetts 02109
617-350-6800

September 1, 2017

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon Daniel R.Warren, James A. Slater, Daniel M. Kavouras, BakerHostetler LLP, 127 Public Square, Suite 2000, Cleveland, OH 44114, Counsel for KeyBank National Association, by Electronic Court Filing on September 1, 2017.

/s/ Kevin T. Peters